O

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADA SHENON, | Case No. 2:18-cv-00240 CAS (AGRx) |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | **Trial Held:** |
| NEW YORK LIFE INSURANCE COMPANY AND DOES 1 THROUGH 10, | Date:    **Oct. 19 – Nov. 2, 2021**<br>Time:    **10:00 a.m.**<br>Ctrm:    **8D, 8th Floor**<br>**Hon. Christina A. Snyder** |
| Defendants. | |

On November 2, 2021, the jury returned a verdict in favor of Defendant New York Life Insurance Company ("Defendant" or "New York Life"). The jury found, in part, that New York Life was not obligated to pay Shenon's claim because it was not covered by the Policy, and because "Shenon knowingly and intentionally misstated material facts in making her claim for insurance benefits." Special Verdict Form, Questions 2 and 3 [Doc. 194]

The Court makes the following Findings of Fact and Conclusions of Law. These Findings[1] follow a careful review of the record and the evidence, and are consistent with the jury's verdict.

---

[1] To the extent that any findings of fact are included in the conclusions of law section, they shall be deemed findings of fact. To the extent that any conclusions of law are included in the findings of fact section, they shall be deemed conclusions of law.

**FINDINGS OF FACT**

1.　　New York Life issued Long-term Care insurance, Policy No. 5634501 ("the Policy") to Plaintiff Ada Shenon on January 1, 2001. (Trial Exhibit "Exh." 1)[2]

2.　　Shenon initiated a claim for benefits under the Policy on June 26, 2017. (Exh. 65)

**Policy**

3.　　An insured is entitled to Long-term Care ("LTC") insurance benefits under the Policy when she needs, receives, and pays for covered care. "If the insured meets the defined requirements with respect to her DL limitations, she must then show that received care covered by the Policy and paid for care covered by the Policy." (Trial Testimony "TT" 11/2/21, testimony of Valerie Besserman "Besserman" 16:17-24) (Pretrial Order, Stipulated Facts "SF" 5)

4.　　As a first requirement for benefits, the policy requires that an individual be certified as "Chronically Ill" by a licensed medical practitioner. To be certified as "Chronically Ill," an insured must meet the following requirements:

> "You will be eligible for the Benefits provided by this Policy when we determine that you…are unable to perform without continual **Substantial Assistance** from another individual 2 or more of the following 6 Activities of Daily Living ["ADL"]:  Dressing, Eating, Continence, Toileting, Transferring and Bathing due to a loss of functional capacity."
>
> > "**Substantial Assistance** means **Hands-On Assistance** and **Standby Assistance**."
> >
> > > "**Hands-On Assistance** means the physical assistance of another person without which you would be unable to perform the Activity

---

[2] All of the referenced trial exhibits have been admitted into evidence.

1    of Daily Living.

2          "**Standby Assistance** means the presence of

3    another person within arm's reach of you that

4    is necessary to prevent, by physical

5    intervention, injury to you while you are

6    performing the Activity of Daily Living.  An

7    example of such assistance is being ready to

8    catch you if you fall while getting into or out

9    of the bathtub or shower as part of bathing,

10   or being ready to remove food from your

11   throat if you choke while eating." (Exh. 1)

12   5.    The "**Activities of Daily Living**" are defined by the Policy as follows:

13          1. *Dressing* - which shall mean putting on and taking off

14   all items of clothing and any necessary braces, fasteners,

15   or artificial limbs.

16          2. *Eating* - which shall mean feeding oneself by getting

17   food in the body from a receptacle (such as a plate, cup,

18   or table) or by a feeding tube or intravenously.

19          3. *Continence* - which shall mean the ability to maintain

20   control of bowel and bladder function; or when unable to

21   maintain control of bowel or bladder function, the ability

22   to perform associated personal hygiene (including caring

23   for a catheter or colostomy bag).

24          4. *Toileting* - which shall mean getting to and from the

25   toilet; getting on or off the toilet, and performing

26   associated personal hygiene.

27          5. *Transferring* - which shall mean the ability to move

28   into or out of bed, a chair or wheelchair.

      6. *Bathing* - which shall mean washing oneself by sponge bath or in either a tub or shower, including the act of getting into or out of a tub or shower. (Exh. 1)

6.     The Policy did not contain a provision addressing whether New York Life would be entitled to void or terminate the Policy in the event Shenon committed fraud in her application for insurance or in a claim for benefits under the Policy.  (Exh. 1)

7.     Toileting assistance under the policy requires "Hands-on" or "Standby" assistance "getting to and from the toilet; getting on or off the toilet, and performing associated personal hygiene." (Exh. 1) Likewise, use of a cane or walker may assist in maintaining independence, but does not qualify as "Hands-on" or "Standby" assistance under the terms of the Policy, which requires assistance from another person. (Exh. 1; TT  10/29/21, Beiter 33:2-8).

8.     The Policy is tax-qualified and states: "Effect of Federal Law: No benefits are payable under this Policy which would cause this Policy to fail to qualify as a Qualified Long-Term Care Insurance Contract under Section 7702B(b) of the Internal Revenue Code [Treatment of qualified long-term care insurance]." (Exh. 1)

9.     If the insured meets the defined requirements with respect to her need for covered ADL assistance, the Policy will reimburse the insured for care that is received and paid for.  Specifically, the Policy provides as follows: "We will pay your charges for Home Health Care up to the Home and Community Based Care Maximum Daily Benefit shown on the Schedule of Benefits." (Exh. 1)

10.     The Policy provides that "Proof of Loss must be given to us in writing at New York Life Insurance Company . . . ." (Exh. 1)

11.     The Policy also provides a 90-day Elimination Period and states as follows: "you must satisfy the Elimination Period before we will pay any benefits under that Benefit provision. We will count only days on which you receive care or

services covered under this Policy, and you meet all of the Policy requirements to be eligible for benefits, except that you have not yet met the Elimination Period." (Exh. 1)

12.   The Policy does not reimburse for care provided by family members. (Exh. 1)

**Shenon's Claim for LTC Insurance Benefits**

13.   In 2004, Shenon applied for and received disability benefits under a disability policy issued by New York Life, and in 2005 or 2006 she was awarded Social Security disability insurance benefits.  She continues to receive disability insurance benefits from New York Life and Social Security. (TT 10/28/21, testimony of Ada Shenon "Shenon" 73:17-74:19)

14.   On June 26, 2017, Shenon called New York Life to file an LTC claim. (SF 8; Exh. 6) She said she was scheduled for knee replacement surgery in August 2017.

15.   During that first call, to support her claimed need for assistance with bathing, Shenon also claimed that she had fallen in the shower four months earlier and hurt her shoulder. (Exh. 6) She reaffirmed during her trial testimony that she fell in the shower. (TT  10/28/21, Shenon 118:24-119:3) However, her treating physician (Stephen Kay, M.D.) recorded in his records and testified at trial that Shenon told him, ten days after her claimed fall, that she fell in her bedroom, on the hardwood floor, not in the shower. (TT 10/26/21, testimony of Stephen Kay, M.D. "Kay" 61:6-17)

**New York Life's LTC Claim Review Process**

16.   Shenon returned claim forms dated July 5, 2017. These included a Provider Questionnaire from her caregiver Galyna Naratovska ("Naratovska") stating that Naratovska provided caregiving services for bathing, showering, dressing, toileting, light housekeeping, meal preparing, and massage. (Exh. 2) Shenon dictated the information that Naratovska included in the caregiver form,

1 and Naratovska copied the information into the form and signed the form. (TT

2 10/28/21, Shenon 134:6-22; TT 10/20/21, Naratovska 70:4-71:16) Naratovska

3 never gave Shenon permission to sign any documents for her. (TT 10/20/21

4 Naratovska 73:21-74:1)

5       17.    Valerie Besserman was the claims leader for the New York Life long-

6 term care claims division, and the manager of the long-term care team throughout

7 the duration of Shenon's claim. (TT 11/2/21 Besserman 11:3-9)

8       18.    To determine the appropriate level of investigation for new claims, the

9 LTC group has developed a process –the Business Integrity Unit ("BIU") review.

10 Pursuant to this process, the information received from insureds is reviewed for

11 identification of the following potential "red flags":

12            "1)  *Diagnoses* - Is the physical or cognitive deficit

13            consistent with the diagnoses?

14            2)  *Treatment Plan* - Is the medical treatment consistent

15            with the diagnoses and the level of physical or cognitive

16            deficit? Are specialists involved?

17            3)  *Level of Care* - Is the assistance requested or provided

18            consistent with the diagnoses, prognoses, and level of

19            physical or cognitive deficit?

20            4)  *Age* - Are the diagnoses, prognoses, and degree of

21            deficit consistent with the claimant's age?

22            5)  *Prognosis* - Is an expected recovery progressing as

23            would be expected for a similar person with similar

24            deficits?

25            6)  *Consistent Information* - Are there marked differences

26            with the information obtained from various professional

27            sources (medical, care, observational)? Is there a marked

28            difference between the care needs indicated by the

claimant at intake and subsequent reported needs on the
BEA and care provider records?

7)  *Policy Effective Date* - Has the policy been effective
less than three years?

8)  *Care Provider Details* - Do non-licensed or informal
caregivers provide the majority of the care?

9)  *Contact with the Claimant* - Is the claimant difficult to
contact or often away from their home or facility? Does
the claimant or family constantly request updates or push
for benefit eligibility approval?

10)  *Contact with the Caregiver(s)* - Is the caregiver rarely
available or do they live a long distance from the
claimant? Does the caregiver constantly request updates
or push for benefit eligibility approval?" (Exh. 21)

19.    Less than 1% of new claims filed during the time beginning with the
onset of Shenon's claim (June 26, 2017) through September 2021 were identified as
having at least three red flags. (TT 11/2/21 Besserman 11:13-12:11)

20.    Three red flags were identified for Shenon's claim, so the claim was
investigated further after the initial review. The three flags were as follows: "Age
(is the diagnosis, prognosis, and degree of deficit consistent with the claimant's
age?)"; "Diagnosis (is the physical or cognitive deficit consistent with the
diagnosis?"; and "Care Provider Details (the care was provided by an unlicensed
caregiver)." (Exh. 22)

### New York Life's Investigation of Shenon's Claim

21.    On July 11, 2017, Ann Doyle, R.N. ("Doyle") visited and interviewed
Shenon at her home in Tarzana to perform an in-person assessment, and then

completed a detailed report. (Exh. 132) Doyle was retained through a vendor utilized by New York Life – Dimensions, Inc.[3]

22.     Shenon made a number of representations to Doyle. Shenon described continual and extensive limitations. She said that she experienced 10+++ out of 10 pain on a constant basis, and that between her caregiver and husband, she received almost 24-hour care, 7 days per week.[4]  She said that because of her condition and her inability to bend and reach, and her loss of range of motion, she required assistance "every time" with bathing and dressing and more than half of the time with transferring, mobility, and toileting. (Exh. 132)

23.     Shenon told Doyle (and confirmed during her trial testimony) that she used a lift chair to get up to a standing position because she could not get up by herself, and that she spent most days in the lift chair. (Exh. 132) During her trial testimony, Shenon confirmed her statements to Doyle. (TT 10/28/21, Shenon 127:4-20; 128:4-12) However, surveillance shows Shenon standing independently from a sitting position both before and after her knee surgery. (Exh. 40.12; 40.13)

24.     Doyle also had Shenon demonstrate certain actions. When asked to walk, Shenon leaned to the side and favored her left knee; she walked slowly and shuffled. (Exh. 132) Shenon also testified that prior to her knee replacement surgery, she "barely walked." (TT 10/28/21, Shenon 119:25-120:3)

25.     Doyle asked Shenon to demonstrate the use of her arms and she observed, "[i]nsured is unable to lift arms above shoulder level, she is not able to reach her feet at all – about to shin area only." (Exh. 132) Shenon confirmed these claimed limitations regarding the inability to raise her arms and difficulty bending during her trial testimony and in her presentation to her retained expert, Glenna Tolbert, M.D. (TT 10/28/21, Shenon 120:24-121:5, 122:3-6; TT 10/27/21,

---

[3] Portions of Doyle's videotaped deposition testimony were read into the record, and she authenticated her report of July 11, 2017 (Exh. 132). (TT 10-20-21at 45)

[4] Shenon told Doyle that her caregiver had provided services 4 hours per day, 6 days a week since May 21, 2017, and that her husband provided 18 hours of care per day, 7 days a week. (Exh. 132)

testimony of Glenna Tolbert, M.D. 212:18-213:14) However, surveillance showed her raising her arms above shoulder level on multiple occasions. (Exhs. 40.5, 40.6, 40.7) Surveillance also showed Shenon bending at the waist on multiple occasions and maintaining that position. (Exhs. 40.8, 40.9, 40.10)

26.    Surveillance from the date and time of Doyle's interview also showed that Shenon submitted an incorrect invoice for that day. Specifically, the surveillance at Shenon's residence started before 7 in the morning – it showed that Naratovska did not arrive Shenon's home until almost 11:00 a.m. and stayed until 2:00 p.m. (Exh. 40.3; 40.22; 45.) In other words, Naratovska was only at Shenon's home during the interview period. However, Shenon submitted an invoice stating that Naratovska had provided services from 7:00 a.m. to 11:00 a.m. on July 11, 2017. (Exh. 45.11)

27.    Dr. Kay submitted a brief Attending Physician Statement ("APS"), stating that Shenon also had a recurring right rotator cuff tear with an onset date of February 20, 2017. (Exh. 67) To support her claim for assistance with bathing, Shenon had stated that she injured her shoulder when she fell in the shower. However, Dr. Kay testified that on March 2, 2017, ten days after her claimed fall, Shenon told him she had fallen in her bedroom, not in the shower. (TT 10/26/21, Kay 61:9-17) Indeed, his notes state that Shenon experienced "A RECENT FALL 10 DAYS AGO IN HER BEDROOM ON HARDWOOD FLOOR." (Exh. 65, emphasis in original)

28.    Also, during her March 2, 2017 visit with Dr. Kay, Shenon had elevation of her arms of 170° (she could raise her arms almost straight up [180°] above her head). (TT 10/26/21, Kay 62:10-63:9) This contrasts with her claim to Doyle and to her retained expert, Glenna Tolbert, M.D., that she could not raise her arms at all. (Exh. 132; TT 10/27/21[5], testimony of Glenna Tolbert, M.D. "Tolbert" 213:2-11)

[5] The referenced testimony of Dr. Tolbert and of Dr. Oney was given on October

1    29.    Shenon had an MRI of her right shoulder and Dr. Kay testified that a

2    person with the same findings as she did could have virtually normal function or

3    could have limitations. (TT 10/26/21, Kay 66:23-67:11) The only restriction

4    Dr. Kay imposed on Shenon as of June of 2017 was no heavy lifting. (TT 10/26/21,

5    Kay 70:3-5) There is no evidence that Dr. Kay ever saw any surveillance of

6    Shenon.

7    30.    Shenon was seen on surveillance during 2017 showing levels of

8    functionality that were inconsistent with what she reported to her treating

9    physicians. (Exhs. 40.3-40.5, 40.8, 40.9, 40.12, 40.21 through 40.24, 40.26) For

10   example, on August 29, 2017, Shenon was observed out of the house from 1:45

11   p.m. to 6:45 p.m. on a shopping and lunch excursion with a female companion.

12   During that afternoon, she was observed using both arms and hands at head level

13   (even though she demonstrated to Nurse Doyle that she could not go above

14   shoulder level). She used her hands to push off and rise from her chair unassisted

15   and she carried her large purse in her right hand, opening heavy doors and entering

16   stores without assistance. (Exh. 26)

17   **Surveillance and an Independent Medical Review from 2017 Did Not Support**

18   **Shenon's Claim**

19   31.    Shenon's knee surgery was rescheduled from August 29, 2017 to

20   October 11, 2017, due to her surgeon's scheduling conflict. (Exh. 205)

21   32.    New York Life then requested that Shenon attend an Independent

22   Medical Evaluation ("IME") to further evaluate her condition and claim. After

23   receiving Shenon's medical records on October 3, 2017, New York Life scheduled

24   an IME for October 10, 2019, so that it could be completed and a decision could be

25   made for the period prior to the knee surgery. (Exh. 125)

26

27   _____

28   27, 2021. However, the cover page of the Trial Transcript for that day erroneously
     referenced October 20, 2021.

33.     Meanwhile, surveillance from September 18, 2017 showed Shenon walking around a shopping center. She entered and exited a vehicle without assistance and was seen bending into the back seat of her car and working on something with her hands. (Exh. 40.26) On October 7, 2017, Shenon was observed entering a restaurant, without a cane, and walking, sitting and standing without assistance. (Exh. 40.4) On October 10, 2017, Shenon was seen shopping at a market – she bent at the waist reached for items and walked around the store unassisted. (Exh. 40.9)

34.     The IME was cancelled by the examining physician for personal reasons. Meanwhile, Shenon was requesting a decision on her claim. (TT 10/29/21 Beiter 61:12-15) To proceed with evaluation of the claim despite the IME cancellation, New York Life arranged for an independent physician to review Shenon's medical records for the time period prior to the surgery. (Exh. 126; TT 10/29/21, Beiter 62:21-63:18) It sought assistance from its vendor, Dane St., and the review was scheduled with Theresa Oney, M.D., a physiatrist, Board-certified in Physical Medicine and Rehabilitation. (Exh. 15, 16; TT 10/27/21 testimony of Teresa Oney, M.D. "Oney" 103:10-12)

35.     New York Life sent Shenon a letter, on October 12, 2017, advising her that because the IME could not be completed prior to her surgery, an independent physician would conduct a peer review of her medical records to assist in evaluating her claim. The letter also reminded Shenon that she would need to meet the Policy's elimination period and incur charges for 90 days before she would be eligible for benefits. (Exh. 128)

36.     New York Life's Clinical Case Manager, Lucy Beiter, compiled medical records related to Shenon, and they were provided to Dr. Oney for review. (TT 10/29/21, Beiter 64:20-65:7)

37.     Dr. Oney completed her medical review and provided a single-spaced, nine page report dated November 14, 2017. (Exh. 16; TT 10/27/21 testimony of Teresa Oney, M.D. "Oney" 114:17-21)

38.     She summarized the medical records and surveillance she reviewed, and ultimately observed that the information provided did not support Shenon's claimed restrictions and limitations or a need for assistance with ADLs. Dr. Oney opined that "[o]verall the insured was able to perform her usual daily activities. She did not appear to be limited by pain or any other musculoskeletal deficits." Dr. Oney also noted that Shenon maintained "only mildly limited range of motion and weakness in the right upper extremity." (Exh. 16) Dr. Oney observed that even before her left knee replacement, Shenon did not need assistance from another individual to walk or transfer. (TT 10/27/21, Oney 122:11-123:6; Exh.16)

39.     In addition to her report, Dr. Oney also completed a questionnaire asking about each potential ADL and stated: "[t]he claimant is not negatively impacted by range of motion or flexibility." Dr. Oney concluded that her review and analysis did not support limitations that would restrict Shenon from performing her ADLs independently. (Exh. 15) Dr. Oney confirmed her findings in her trial testimony. (TT 10/27/21 Oney 122:11-123:6; Exh. 16)

40.     On December 4, 2017, New York Life sent Shenon a letter explaining that the peer reviewer had concluded that the records did not support a need for substantial assistance with two or more ADLS, and that her claim could not be approved at that time. However, New York Life requested that Shenon sign an authorization to obtain the records relating to her October 11, 2017 surgery, and offered to have an IME conducted once she had fully recovered from the surgery. The letter asked Shenon to "[p]lease contact Julie Nice when you are ready for the examination, and we will arrange to have someone contact you to schedule the IME", and it provided Shenon with Julie Nice's direct extension. (Exh. 130; SF 8) Shenon never contacted Nice.

1

2 **Shenon Submitted Inaccurate Caregiver Invoices**

3     41.    New York Life also asked Shenon to return completed invoices (with

4 the required information regarding dates and times of care and type of care

5 provided). (Exh. 130)

6     42.    Shenon testified that she kept track of Naratovska's hours on scrap

7 paper when the services were provided and that she would then throw away the

8 scraps of paper after completing the New York Life invoices. (TT 10/28/21 Shenon

9 137:1-8)

10     43.    Shenon faxed New York Life a letter on October 20, 2017 with

11 invoices for June 26, 2017 through October 20, 2017 which provided detailed

12 information regarding the dates, times and types of care provided. (TT 10/28/21

13 Shenon 137:9-138:23) Shenon signed each invoice, attesting "Personal Care

14 Services listed above were provided to me, the insured, at the below address, on the

15 dates indicated above." The invoices also included Naratovska's signature

16 certifying "the services listed on this Personal Care Invoice were provided by me in

17 the insured's home on the dates indicated." The invoices stated that Naratovska

18 provided assistance with bathing, dressing and toileting. (Exh. 45)

19     44.    When the invoices were received, Valerie Besserman, Claim Manager

20 for New York Life, in accordance with her custom and practice, had a comparison

21 completed between the dates and times stated by Shenon in her invoices and the

22 information reflected in the surveillance. (TT 11/2/21, Besserman 22:2-21)

23     45.    The comparison showed that Shenon had not received the care claimed

24 on her invoices. The surveillance showed more than fifteen instances between June

25 and October of 2017 when Shenon was not receiving care on the dates and times

26 she said she was receiving and paying for care. (Exh. 45; Exh. 26, 28, 30) In some

27 instances, the surveillance showed that the caregiver had never gone to Shenon's

28 home on the date and time claimed. In other instances, Shenon and the caregiver

were seen in different locations at the time care was being claimed. (Exh. 45; Exh. 26, 28, 30; TT 11/2/21 Besserman 22:22-25:13)

46.     The surveillance was produced to Shenon and she saw that it directly conflicted with her invoices on multiple occasions. (TT 10/28/21 Shenon 138:24-139:5) After seeing these conflicts, Shenon sent to New York Life a new set of invoices that matched the surveillance during the July to October 2017 period. (TT 10/28/21 Shenon 139:6-13; Exh. 222) The new invoices had different times and different amounts (both in terms of hours and money) and included photocopied signatures of Naratovska. (TT 10/28/21 Shenon 139:22-141:19; TT Besserman 11/2/21 25:14-27:9)

47.     On September 3, 2019, New York Life determined that a Suspected Fraud Referral to the California Department of Insurance was required, and it made the referral. (Exh. 49)

**Information Obtained During Litigation Showed Further Inconsistencies Regarding Shenon's Claim**

48.     Rather than responding to New York Life's letter of December 4, 2017 offering to provide an IME, Plaintiff filed a Complaint in this action on December 11, 2017, one week after the December 4, 2017 letter. The Complaint cites to the December 4, 2017 letter, and alleges that New York Life wrongfully denied Shenon's claim for benefits under the Policy. During litigation, New York Life continued to review claim information. (TT 11/2/21 Besserman 21:8-13) It also conducted further surveillance in 2018 and 2021. (Exh. 34, 36, 38)

49.     The 2018 surveillance conducted by New York Life showed Shenon walking without a cane while going to a salon to get a manicure, walking and shopping for hours at a mall without a cane, walking and shopping for groceries for hours without a cane, and driving herself to meet others for lunch at a restaurant, where she was mobile and able to walk, sit, stand and move without any assistance. She also drove on other occasions and needed no assistance entering or exiting her

vehicle. Shenon bent at the waist repeatedly, reached for items and lifted items without assistance. On one occasion while shoe-shopping, she bent down repeatedly at the waist, from both a standing and seated position, and balanced on one foot while changing shoes. (Exh. 34, 36)

50.     New York Life also conducted further updated surveillance in 2021 which continued to show Shenon's ability to function independently.  She was seen using her arms above her head, pulling, bending at the waist, walking independently, and driving. (Exh. 38) Moreover, even though she claimed to be in an extremely debilitated condition, requiring care for her most basic functions, she was seen on surveillance, not only driving and shopping independently, but doing so while her young granddaughter was in her care. (Exh. 38; 40.2) Presumably, Shenon would not drive and shop alone with her young granddaughter if she did not believe she could do so safely.

51.     The parties both engaged experts.  Dr. Tolbert was hired by Shenon's counsel. (TT 10/27/21 Tolbert 198:14-16) Dr. Tolbert examined Shenon three times and provided four reports between January of 2019 and August of 2021. (TT 10/27/21, Tolbert 198:14-16) Dr. Tolbert was of the opinion that Shenon needed hands-on or standby assistance with all of her ADLs except eating. (TT 10/27/21 Tolbert 231:8-17)

52.     On August 7, 2019, a medical examination was conducted at New York Life's request by Kevin Ehrhart, M.D., a Board-certified orthopedic surgeon. (TT 10/28/21 Ehrhart 9:22-25) He "completely disagreed" with Dr. Tolbert. (TT 10/28/21 Ehrhart 35:24-36:22)

53.     Based on his two examinations of Shenon on August 7, 2019 and October 4, 2021, Dr. Ehrhart opined that Shenon could perform all of her ADLs independently. (TT 10/28/21 Ehrhart 28:24-29:2) Dr. Ehrhart specifically opined that Shenon's diagnosis with fibromyalgia and depression, and her complaints of

chronic pain would not affect her ability to perform her ADLs independently. (TT 10/28/21 Ehrhart 27:20-28:17)

**Special Verdict Form**

54.    In the Special Verdict Form, the jury answered the questions as set forth below:

> **Question 1**.  Did New York Life breach the insurance contract by not paying policy benefits to Ms. Shenon?
>
> **Answer to Question 1**.  No.
>
> **Question 2**.  Do you find that New York Life was not obligated to pay Ms. Shenon's claim because it was not covered by her insurance policy?
>
> **Answer to Question 2**.  Yes.
>
> **Question 3**.  Do you find that New York Life was not obligated to pay Ms. Shenon's claim because Ms. Shenon knowingly and intentionally misstated material facts in making her claim for insurance benefits?
>
> **Answer to Question 3**.  Yes.

(Special Verdict Form [Doc. 194]) Based on a careful review of all of the evidence, this Court finds this jury finding to be supported by the evidence.

## CONCLUSIONS OF LAW

55.    Pursuant to the legal framework outlined in <u>Lincoln Benefit Life Co. v. Dallal</u>, 520 F. Supp. 3d 1237 (C.D. Cal. 2021), <u>aff'd</u>, No. 21-55152, 2022 WL 605709 (9th Cir. Mar. 1, 2022), and the jury's finding that "Ms. Shenon knowingly and intentionally misstated material facts in making her claim for insurance benefits," the Court has the equitable power to void the Policy.

56.    However, the Court declines to exercise its equitable power to void the Policy, because <u>Dallal</u> is distinguishable, and because voiding the Policy on the record now before the Court would be inappropriate

57.    In <u>Dallal</u>, a fraud claim was affirmatively before the Court and submitted to the jury, which found that the Dallals "engage[d] in fraud against

Lincoln in connection with the long-term care policy[.]"  See Lincoln Benefit Life Company v. Alexander Dallal et al, No. 2:16-cv-09307-MWF-E, Dkt. 172. Moreover, the Dallals "deceitfully and systematically cheated [the insurer] out of hundreds of thousands of dollars in a several-years-long scheme.  Dallal, 520 F. Supp. 3d at 1246.

58.    Here, although the jury found that Shenon "knowingly and intentionally misstated material facts in making her claim for insurance benefits," there was no affirmative fraud claim at issue.  As a result, Shenon did not conduct discovery or raise affirmative defenses with respect to New York Life's allegations of fraud.  Moreover, unlike Lincoln Benefit Life in Dallal, New York Life was not cheated out of substantial sums of money in a long-running scheme, because it never paid any benefits to Shenon under the Policy.

59.    Accordingly, on the record before it, the Court concludes that exercising its equitable power to void the Policy would be inappropriate.  If New York Life intends to pursue the voiding of the policy, it may a bring a fraud claim against Shenon, who in turn will be entitled to assert defenses to that claim.

DATED:  April 15, 2022

HON. CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE